UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x

MOHAMMAD LADJEVARDIAN, *et al.*                    :

           Plaintiffs,                          :

           v.                                     :      06-cv-3276 (TPG)

THE REPUBLIC OF ARGENTINA,                          :

           Defendant.                          :
------------------------------------------------------- x

MICHELE COLELLA and DENISE DUSSAULT,  :

           Plaintiffs,                          :

           v.                                     :      04-cv-2710 (TPG)

THE REPUBLIC OF ARGENTINA,                          :

           Defendant.                          :
------------------------------------------------------- x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/26/16

## OPINION

Plaintiffs, who hold money judgments against the Republic of Argentina, have filed motions for writs of execution and turnover orders directed at Argentine assets purportedly held by two nonparty financial institutions. The court finds that the motions are without merit and must be denied.

### Background

In the 1990s, the Republic issued bonds pursuant to a Fiscal Agency Agreement ("FAA"). After the Argentine economy collapsed in 2001, the Republic failed to make scheduled payments on the bonds. FAA bondholders

began filing actions in this court seeking money judgments for the outstanding principal and interest.

Because the Republic did not dispute that it had stopped making scheduled payments, FAA bondholders were often successful in obtaining money judgments. With these judgments in hand, some bondholders tried to execute upon Argentine property as a way to recoup their losses. These attempts were largely futile. *See, e.g.*, *EM Ltd. v. Republic of Argentina*, 865 F. Supp. 2d 415, 417 (S.D.N.Y. 2012).

For years the Republic refused to entertain meaningful negotiations. But after a new administration came to office, the Republic announced a global settlement proposal in February 2016. Under the supervision of Daniel A. Pollack, the court-appointed Special Master, the new administration also entered into negotiations with many FAA bondholders and began reaching settlement agreements. After just a few weeks, bondholders owning the vast majority of outstanding claims had agreed to settle, leaving only a few who continued to hold out for something better.

The Republic needed to raise substantial funds to pay the settlements it had reached. With this court's blessing, the Republic returned to the capital markets after years out in the cold. *See* Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Mar. 15, 2016) (approving the settlement payment mechanism). On April 22, 2016, the Republic effected a major bond issuance. Through a private placement, seven financial institutions—known as "initial purchasers"—bought new Argentine bonds for resale to their clients.

Deutsche Bank Securities Inc. coordinated this process by collecting funds from each initial purchaser to pay for the bonds.   Ultimately, the issuance raised $9.371 billion.

Shortly before the bond issuance, the Republic entered into a Settlement Trust Agreement that named The Bank of New York Mellon ("BNYM") as Settlement Trustee for a Settlement Trust.   *See* Bresnahan Decl. Ex. C ("Settlement Trust Agreement" or "STA").   For all proceeds paid into the Trust, the Republic irrevocably assigned all rights, title, and interest to BNYM.   STA § 2.   The Trust's principal beneficiaries were a defined list of settling FAA bondholders, but the Settlement Trust Agreement also outlined a contingency plan.   If for any reason BNYM could not distribute all of the proceeds to settling FAA bondholders by October 22, 2016, the surplus would go to Banco Central de la República Argentina ("BCRA") to repay debts the Republic owed to BCRA. *See* STA § 6(b).

Once Deutsche Bank collected the $9.371 billion in funds from the initial purchasers, it paid $6.251 billion directly to a group of FAA bondholders who had agreed to settle with the Republic prior to February 29, 2016.   Deutsche Bank then paid the balance to the Trust at BNYM.   Meanwhile, the initial purchasers received the bonds, which they could then resell to their clients.

Four days after the bond issuance, the Ladjevardian plaintiffs (06-cv-3276) brought a motion for a writ of execution and turnover order directed at Argentine assets purportedly held by nonparty J.P. Morgan Securities LLC ("JPM").   Three days later, these same Ladjevardian plaintiffs filed an almost-

identical motion, this time directed at nonparty BNYM.  The Colella plaintiffs (04-cv-2710) then filed the same kind of motion directed at BNYM.  Both of these plaintiffs specifically targeted only those "proceeds" from the bond issuance that are "not being used to pay" settlements with other bondholders. *E.g.*, Colella Br. at 3.  All three of the motions are now before the court.

Discussion

Federal Rule of Civil Procedure 69(a) allows federal courts to enforce money judgments by an action that comports with the procedures of the state where the court is located.  Plaintiffs move for turnover orders and writs of execution pursuant to New York Civil Practice Law and Rules ("CPLR") sections 5225(b) and 5230.  The court will consider each of those sections in turn.

**1. Turnover Orders under CPLR § 5225(b)**

A turnover order under CPLR § 5225(b) allows a judgment creditor to execute upon property that belongs to a judgment debtor but is in the possession of a third party.  *See N. Mariana Islands v. Canadian Imperial Bank of Commerce*, 717 F.3d 266, 267 (2d Cir. 2013).  By its express language, § 5225(b) provides for a "two-step analysis" in determining whether the third party must turn over the property to the creditor.  *See Beauvais v. Allegiance Sec., Inc.*, 942 F.2d 838, 840 (2d Cir. 1991).

Under the two-step analysis, the court must first find that the debtor "has an interest" in the property the creditor seeks to obtain.  *Id.*  If the court makes that finding, it must then make one of two additional findings: it must find *either* that the debtor is entitled to possess the property, *or* that the

creditor's rights to the property are superior to those of the third party.  *Id.* Only after the court makes an appropriate finding under *both* steps may it order the third party to turn over property to the creditor.  *Id.* at 840–41. Implicit in this analysis is that the third party actually has the property the creditor seeks to obtain.

a.  <u>*The Relevant Property*</u>

As a threshold matter, the third party must hold property of the kind the creditor seeks to obtain.  Here, plaintiffs limit the relevant property to proceeds from the bond issuance not being used to pay settlements with other bondholders.  *E.g.*, Colella Br. at 3.

The record reveals that JPM's only role in the bond issuance was as an initial purchaser of bonds for resale to its clients.  *See, e.g.*, Miguens Decl. ¶¶ 3–5.  JPM simply paid for and received bonds—*it did not obtain any proceeds from the issuance*.  Plaintiffs' reply brief seems to concede as much by implicitly abandoning their request for relief as to property held by JPM.  *See, e.g.*, Colella Reply at 9.  Thus, because JPM never held any of the property targeted by plaintiffs, relief under § 5225(b) is unavailable, and the court need not reach JPM's alternate defense that plaintiffs' service of process was improper.

BNYM, by contrast, admits that it holds proceeds from the bond issuance.  Accordingly, the court will now apply the two-step analysis under CPLR § 5225(b) to those proceeds.

b. *The Republic's Interest in the Property*

As noted above, a creditor seeking to reach property held by a third party must first show that the debtor "has an interest" in that property. *See EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 476 n.13 (2d Cir. 2007).

Plaintiffs offer no evidence that the Republic has any interest in the proceeds held by BNYM. This is unsurprising given the Settlement Trust Agreement's plain terms, which show that the Republic retains no interest in proceeds paid into the Trust. The Republic "irrevocably assigned" to BNYM its "right to receive the full amount" of any proceeds. STA § 2. The Republic further agreed that "neither the Republic nor any agency or instrumentality of the Republic shall have any right, title or interest (including, for the avoidance of doubt, proprietary or reversionary interest) of any kind" in the proceeds. *Id.* § 7. And the Republic's filings in opposition to these motions again disavow any interest in the proceeds.[1] Instead of filling the Republic's coffers, then, all proceeds were "held . . . in trust" by BNYM "for the benefit" of certain beneficiaries—none of which is the Republic. *Id.* §§ 2, 7.

Plaintiffs suggest that the Republic is deceiving its creditors and the court by naming BCRA as a potential beneficiary of the Trust. To the extent that plaintiffs seek to cut BCRA from the same cloth as the Republic, their

---

[1] *See also* Bresnahan Decl. Ex. B, at Purchase Agreement § 2(c) ("The Republic hereby irrevocably: . . . transfers and assigns (and grants a first priority security interest in) the Republic's right to receive the payment . . . of the [proceeds] of the Offering"); *id.* Ex. E, at 29 ("All of the Republic's rights, title and interest in the Settlement Amount will be irrevocably assigned, and a first priority security interest will be created in all of the Republic's rights to receive the Settlement Amount, in favor of the settling claimants.").

argument fails.   Under the Settlement Trust Agreement, any proceeds that remain in the Trust after the settling FAA bondholders are paid may ultimately go to BCRA, in its capacity as the Republic's creditor.   But as the Second Circuit has made clear, BCRA is separate from the Republic and should not be treated as if it were the Republic.   *EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78, 99 (2d Cir. 2015).   Thus, the Republic derives no interest in the proceeds merely because BCRA has some residual interest in any surplus from the Trust.

In short, the Republic has no interest whatsoever in the property plaintiffs seek to obtain.   Plaintiffs cannot use § 5225(b) to execute upon the proceeds held by BNYM.

c.   *The Republic's Entitlement to Possess the Property*

Even if plaintiffs could show that the Republic has an interest in the relevant property, they must still satisfy the second step under § 5225(b).   One way to do so would be to establish that the Republic is entitled to *possess* the proceeds held by BNYM.   *See Beauvais*, 942 F.2d at 841.

As the Second Circuit has already found in a related case, "[f]or this prong to be met, the Republic must be able to retrieve the disputed assets back" from BNYM.   *See Dussault v. Republic of Argentina*, 616 F. App'x 26, 27 (2d Cir. 2015).   Here, the Settlement Trust Agreement ensures that the Republic is never "entitled to the possession" of the proceeds because it "is barred from getting the funds back" from BNYM.   *See id.* at 28.   As discussed

above, all proceeds were "irrevocably assigned" to BNYM "upon the closing." STA § 2; *see also id.* § 4.

Moreover, the Settlement Trust Agreement grants BNYM a first priority security interest in those proceeds, and—"for the avoidance of doubt"—the Republic expressly disclaims any "proprietary or reversionary interest" asserted by the Republic or any of its agencies or instrumentalities. *Id.* §§ 2, 7. The Republic can also claim no future right to possess proceeds that will soon be paid to settling FAA bondholders, if indeed those payments have not yet occurred. Even if some proceeds remain after that process ends, the Settlement Trust Agreement irrevocably assigns them to another of the Republic's creditors, BCRA.

In sum, even if the Republic had a theoretical interest in the proceeds, it could not possess them because it could not claw them back from BNYM or the Trust's beneficiaries. This fact serves as an independent bar to relief under § 5225(b).

### d. *Plaintiffs' Comparative Rights to the Property*

An alternate way for plaintiffs to satisfy the second step under § 5225(b) would be to show that their rights to the proceeds are superior to the rights of BNYM. *See Beauvais*, 942 F.2d at 840. Plaintiffs' only argument on this score is that they have money judgments that the Republic has failed to satisfy, whereas BNYM "does not have an interest in the proceeds." *See, e.g.*, Colella Br. at 6–7.

The Second Circuit has already rejected a similar argument made by a plaintiff creditor in a related Argentina case.  In *Dussault v. Republic of Argentina*, the plaintiff argued that she had a superior claim "because she is owed more money, and has been denied payment for longer," than the beneficiaries of the BNYM trust at issue in that case.  616 F. App'x at 28.  But the Court of Appeals found it would be improper to engage in "subjective equitable assessments of the relative fairness of paying one class of creditor or another."  *Id.*  Instead, New York law assesses superiority of rights "based on legal interests in the property."  *Id.*

Just like the plaintiff in *Dussault*, plaintiffs here are unsecured general creditors who cannot claim superiority simply because they hold unsatisfied money judgments.  Not only does BNYM have its own senior security interest in the proceeds, but BNYM has a legal interest in holding the proceeds in trust for beneficiaries who have rights to receive them.  *See* STA §§ 2, 4.  There is no basis to elevate plaintiffs' rights above those of BNYM, let alone those of the Republic's other creditors.  To do so would be to engage in the kind of "subjective equitable assessments" that New York law disdains.  *See Dussault*, 616 F. App'x at 28.

Plaintiffs halfheartedly claim that their rights are superior by suggesting that the Republic may have perpetrated a fraudulent conveyance.  It is true that the Second Circuit in *Dussault* made particular note that a creditor's rights might be superior to a third party's if the debtor fraudulently conveyed the property to the third party.  *Id.*  But here, as in *Dussault*, "the Republic's

transfer of funds to [BNYM] was not a fraudulent conveyance, because the Republic was attempting to pay other creditors for whom [BNYM] acts as trustee." *See id.* "At most," then, what the Republic has done here amounts to "a preference among creditors"—which is certainly permissible—and not a fraudulent conveyance. *See id.* at 28; *see also In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005). Plaintiffs come nowhere close to showing fraudulent conveyance under New York law, and they cannot establish superiority of rights merely by insinuating that something sinister might be afoot.

Plaintiffs have failed to establish superior rights to the proceeds. For this additional reason, they cannot obtain relief under § 5225(b).

## 2. Writs of Execution under CPLR § 5230

Plaintiffs also seek a writ of execution under CPLR § 5230, which allows courts to authorize "an execution" on property to satisfy a judgment. An execution is an instrument "delivered to the court's enforcement officer, usually the sheriff, directing the sheriff to levy against any nonexempt property that can be found belonging to the judgment debtor." CPLR Commentaries 5230:1. Like § 5225(b), § 5230 requires a creditor to show that the debtor "has an interest" in the property. CPLR § 5230(a). For the reasons outlined above, the Republic does not have an interest in the proceeds and, accordingly, plaintiffs are not entitled to a writ of execution under CPLR § 5230.

## 3. The Foreign Sovereign Immunities Act

The Republic offers an alternate barrier to the relief plaintiffs seek—the Foreign Sovereign Immunities Act ("FSIA"). Unless an FSIA exception applies, a

foreign state's property in the United States is immune from execution. 28 U.S.C. § 1609. One such exception is for property that is both located in and "used for a commercial activity in the United States." 28 U.S.C. § 1610(a). Importantly, though, property held by a third party solely for the purpose of later transfer to a foreign state is not being "used" by the state. *See Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 131 (2d Cir. 2009). Immunity from execution would still apply in such circumstances.

Here, plaintiffs allege in part that BNYM is merely holding proceeds that may ultimately find their way to the Republic, perhaps via BCRA. Even if that were true, plaintiffs would run headlong into execution immunity under the FSIA because the property they target is not being "used for a commercial activity" by the Republic. Rather, it is in the hands of a third party, BNYM, and is not being—and in fact *cannot* be—"used" by the Republic at all. *See infra* Sections 1(b) & (c). The Republic does not have the "opportunity to use" property that is not "*in the hands of the Republic*," and the FSIA therefore precludes execution on any proceeds held by BNYM. *See id.* at 131.

### 4. Discovery and a Restraining Order

As an afterthought, plaintiffs request discovery and a restraining order, but only if the court "requires more information to identify specific accounts" that contain the Republic's property in the United States. *E.g.*, Colella Br. at 9. Because the court does not require that information to resolve these motions, it denies plaintiffs' informal request. If plaintiffs truly wish to seek discovery and a restraining order, they should do so through the proper procedures rather

than in such a throwaway fashion.  Given what the court has found above, it seems unlikely that such speculative discovery requests would be "reasonably related to the discovery of attachable assets," but certainly plaintiffs' showing so far is inadequate.  *See Rossini v. Republic of Argentina*, 453 F. App'x 22, 24–25 (2d Cir. July 1, 2011) (summary order).

<u>Conclusion</u>

Plaintiffs are part of a steadily shrinking holdout group.  Rather than settle with the Republic, they have chosen to reject the global proposal and seek full satisfaction of their judgments through Rule 69.  Plaintiffs may certainly continue to hold out for a better deal, but the court cannot allow them to execute upon property that is not the Republic's while they do.

For the foregoing reasons, the court denies plaintiffs' motions for writs of execution and turnover orders.

SO ORDERED.

Dated: New York, New York
      May 26, 2016

_____
    Thomas P. Griesa
    United States District Judge

12